Luis Alberto SOTELO–AQUIJE,
Petitioner–Appellant,

v.

William S. SLATTERY, District Director of the New York District of the Immigration & Naturalization Service, Defendant–Appellee,

Roseanne C. Sonchik, Acting Assistant District Director for Detention and Deportation of the New York District of the Immigration & Naturalization Service, Respondent–Appellee.

No. 1174, Docket 94–2499.

United States Court of Appeals, Second Circuit.

Argued March 29, 1995.

Decided July 28, 1995.

Anne Pilsbury, Brooklyn, NY (Central American Legal Assistance, of counsel) for petitioner-appellant.

F. James Loprest, Jr., Sp. Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the S.D.N.Y., Diogenes P. Kekatos, Gideon A. Schor, Asst. U.S. Attys., of counsel) for appellee.

Before: MINER and PARKER, Circuit Judges, and SCHEINDLIN, District Judge.*

MINER, Circuit Judge:

Petitioner-appellant Luis Alberto Sotelo–Aquije appeals from an order entered in the United States District Court for the Southern District of New York (Martin, J.) denying appellant attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) ("the EAJA"). In the action giving rise to the application for fees, the Board of Immigration Appeals ("the Board") had denied Sotelo's application for asylum in this country, and the district court affirmed that decision. We reversed, and held that the record before us compelled the conclusion that Sotelo had a well-founded fear of persecution based on his political opinions. Sotelo then made an application in the district court for attorney's fees and costs. The district court denied this fee application, having concluded that the government's position in the underlying litigation had been "substantially justified" within the meaning of the EAJA. For the following reasons, we reverse the order of the district court and remand for an assessment of an appropriate amount of fees and costs.

## BACKGROUND

In *Sotelo–Aquije v. Slattery*, 17 F.3d 33 (2d Cir.1994), this court reversed the district court's denial of Sotelo's petition for a writ of habeas corpus, finding that the Board of Immigration Appeals' decision denying Sotelo asylum was not supported by substantial evidence. We decided that the record before the Board "compel[led] the conclusion that Sotelo had a well-founded fear of persecution on account of his political opinion and actions." *Id.* at 38. On the basis of our decision in that case, Sotelo made this application for fees under the EAJA. While we presume familiarity with our prior opinion, the nature of our review here requires us to describe the proceedings below at some length.

* The Honorable Shira A. Scheindlin of the United States District Court for the Southern District of

Sotelo arrived in the United States from Peru in November of 1992. Immediately upon his arrival, he was taken into detention by the Immigration and Naturalization Service ("INS"), and exclusion proceedings were initiated against him. Sotelo then filed an application for asylum and withholding of deportation, claiming that he feared that he would be harmed by members of the Shining Path, a revolutionary Maoist organization, if returned to Peru. Sotelo claimed that the Shining Path rebels had threatened him in connection with his civic and charitable activities as a locally elected leader in the Ciudad Urbana Autogestionaria de Villa El Salvador ("CUAVES"), the governing body of his hometown of Villa El Salvador. CUAVES has carried out "progressive economic and political development," and its work in this regard has been recognized "nationally and internationally." *Id.* at 35.

Sotelo's application for asylum initially was considered by an immigration judge ("IJ"). Before holding a hearing on the matter, the IJ requested information from the United States government regarding the socio-political situation in Peru. In response, the State Department issued a brief advisory opinion which stated:

> The Sendero Luminoso (Shining Path) is a revolutionary organization that has been intent on destroying Peruvian institutions and foreign influence.... [Its] violence is directed at government officials, military and police personnel, politicians, industrialists, businessmen, bankers and other professionals, development and human rights workers, educators and students, labor leaders and workers, Indian campesinos, religious personn[e]l, and foreigners.

> The choice of victims does not appear to be the result of their personal political views. Rather, the [Shining Path] uses force to intimidate and recruit, to coerce financial support, and to retaliate against those inside and outside the government who are perceived as opposing its goals or undermining its support....

New York, sitting by designation.

While it is true that the Shining Path guerrillas have targeted community leaders in some areas, such people who move to communities where they are not well known generally are able to find peaceful residence.

In February of 1993, the IJ held a hearing on Sotelo's application for asylum. In support of his application, Sotelo presented his own testimony, CUAVES membership material, background material concerning conditions in Peru, and other evidence describing conditions in Villa El Salvador. During his testimony, Sotelo described his involvement in CUAVES, and he explained that the Shining Path was a guerilla group whose campaign to reach power included violence against police officers, students, professors, and political leaders. Sotelo stated that the Shining Path was responsible for the deaths of approximately thirty civic leaders in his hometown. Sotelo claimed that he openly criticized the Shining Path, and, as a result, that the Shining Path wanted him to resign from his position with CUAVES. Sotelo testified that he had received four notes from the Shining Path, each requesting his resignation from CUAVES and threatening violence against him should he fail to comply. In addition, according to Sotelo, certain other CUAVES leaders had received similar threats.

At the close of the hearing, the IJ denied Sotelo's application for asylum and withholding of deportation. The IJ found that Sotelo failed to meet his burden of demonstrating that his alleged fear of persecution was well-founded, and noted that: Sotelo had not documented the alleged threats he described; Sotelo failed to demonstrate he could find no safe haven in Peru; and Sotelo's work "as a community organizer was not a political act which could be punished by the Shining Path and that the threatening letters did not amount to political persecution." The IJ also denied a motion for a continuance made by Sotelo for the purpose of presenting expert testimony on the Shining Path's violent activities and retaliation against its political opponents.

Sotelo appealed this decision to the Board, which also rejected his asylum claim. The Board found that Sotelo reasonably feared persecution from the Shining Path, but concluded that the organization targeted him not on account of his political opinion, but on account of his position in CUAVES. Noting that the Shining Path's objective was to overthrow existing governmental units in Peru, the Board concluded that the Shining Path posed a generalized threat to all authority figures in Peru and therefore that the danger to Sotelo arose from the nature of his position. The Board also rejected Sotelo's claim that he was persecuted for his membership in a particular social group. In making this determination, the Board relied on the fact that CUAVES leaders who were less open in their opposition to the Shining Path were not threatened. The Board also noted that it may have been possible for Sotelo to have found safety in another part of Peru.

In sum, however, the Board found Sotelo's testimony "believable, consistent, and coherent," and "that there was no issue below regarding his credibility and that his claim was substantially supported by general documentary evidence." Nonetheless, the Board suggested that Sotelo could have provided additional corroborative evidence of the threats against him. Finally, the Board denied a motion to reopen the hearing before the IJ, having determined that the further evidence of the Shining Path's terrorism would not be likely to lead to a different result. *Id.* at 36.

Sotelo then filed a petition in the district court for a writ of habeas corpus, challenging the Board's decision to deny him asylum and withholding of deportation. The district court denied the petition and affirmed the Board's decision, holding that substantial evidence supported the Board's conclusion that Sotelo had failed to demonstrate that the danger he faced was due to his political opinion rather than his position as a government official. The court also concluded that Sotelo had failed to establish that his fear of the Shining Path would be justified regardless of where he lived in Peru.

On appeal, we reversed the district court, concluding that the Board's factual findings "compel[led] the conclusion that Sotelo had a well-founded fear of persecution on account

of his political opinion and actions opposing the Shining Path [guerrillas]." *Sotelo,* 17 F.3d at 38. We determined "that the BIA's conclusion that Sotelo was not targeted because of his political acts and opinions is not supported by the record and indeed [wa]s contradicted by the BIA's own findings." *Id.* at 35. In reaching our conclusion, we relied upon the Board's own conclusion that "Shining Path victim[s] are generally targeted based on their activities or vocalism that opposed the organization or its goals," and also on the evidence that CUAVES leaders who had either resigned their positions or had been "reserved" towards the Shining Path had not been targeted for threats. *Id.* at 37. In other words, we noted, "the BIA acknowledged that Sotelo spoke out against the Shining Path and that only those CUAVES members who actively opposed the guerrilla group became targets of its violence." *Id.* We held that this compelled the conclusion that Sotelo had a well-founded fear of persecution based on his political opposition to the Shining Path.

We also addressed two other points raised in the Board's decision. First, we observed that the fact that Sotelo had not yet been physically harmed was not determinative of whether he had a well-founded fear of persecution. *Id.* Second, we took issue with the Board's statement that any persecution against Sotelo was confined "to his local hometown" and that "an asylum claim is not established where a claim based on non-governmental action involves a local area of the country." *Id.* We noted that the asylum statute applied to claims of persecution by non-governmental organizations that the government could not control, and that the "documentary material [already submitted by Sotelo] in fact establishes that the Shining Path's reaches in Peru are countrywide." *Id.* at 37–38.

Sotelo thereupon brought this application for fees and costs under the EAJA, which the district court denied after concluding that the Board's position, although incorrect, had been "substantially justified." In the district court's view, Sotelo's claim had been rejected by the Board for lack of evidence, and the Board's assessment of that evidence, although erroneous, rendered its determination "substantially justified." While recognizing that corroborating evidence is not necessary, the district court reasoned that the Board could rely on the absence of such evidence, particularly where the Board believed that favorable corroborating evidence was available to the petitioner. The district court also found that the Board reasonably had relied on the State Department advisory opinion. Sotelo appeals.

## DISCUSSION

### 1. General

■ The Equal Access to Justice Act permits parties who successfully challenge government actions in the courts to recover the costs of litigation when "the position of the United States" was not "substantially justified" and where "special circumstances" do not render such an award "unjust." 28 U.S.C. § 2412(d)(1)(A). With respect to administrative actions, the term "position of the United States" includes the government's litigating position as well as the position taken by the administrative agency on the merits. *Id.* § 2412(d)(2)(D). To prove that its position was "substantially justified," the government bears the burden of showing that its position had "a reasonable basis in both law and fact." *Federal Election Commission v. Political Contributions Data, Inc.,* 995 F.2d 383, 386 (2d Cir.1993) (citing *Pierce v. Underwood,* 487 U.S. 552, 556 & n. 2, 108 S.Ct. 2541, 2545 & n. 2, 101 L.Ed.2d 490 (1988)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1064, 127 L.Ed.2d 384 (1994). "The test is essentially one of reasonableness." *Id.* (internal quotation marks omitted).

■ The district court's determination as to whether the government's position was substantially justified is "a multifarious ... question, little susceptible ... of useful generalization" as either a question of law or fact. *Pierce,* 487 U.S. at 562, 108 S.Ct. at 2548. In recognition of the complexity of the issue, this court will reverse the district court's determination only for an abuse of discretion. *Id.; see also Cassuto v. Commissioner of Internal Revenue,* 936 F.2d 736, 740 (2d Cir.1991).

### 2. Substantial Evidence vs. Substantial Justification

■ As an initial matter, we must reject Sotelo's contention that, because the panel of this court that addressed the merits of his asylum claim held that the administrative record *compelled* the conclusion that he had a well-founded fear of persecution, it necessarily follows that the Board's position was not substantially justified. In the merits portion of an appeal from a Board decision, this Court asks whether the Board's determination is "supported by substantial evidence." In contrast, the issue for EAJA purposes is whether the agency had a reasonable basis in fact or law to take the position that it did, at the time that it made its decision. *See Pierce*, 487 U.S. at 560–61, 108 S.Ct. at 2547–48 (the question is "not what the law now is, but what the Government was substantially justified in believing it to have been"). We therefore hold, as have other circuits that have considered this question, that there is no congruence between the "substantial evidence" standard and the "substantially justified" standard. *See, e.g., United States v. Paisley*, 957 F.2d 1161, 1167 (4th Cir.), *cert. denied,* ── U.S. ──, 113 S.Ct. 73, 121 L.Ed.2d 38 (1992); *Welter v. Sullivan*, 941 F.2d 674, 676 (8th Cir.1991); *Broussard v. Bowen*, 828 F.2d 310, 311–12 (5th Cir.1987).

Nor does *Federal Election Commission v. Political Contributions Data, Inc.*, 995 F.2d 383 (2d Cir.1993), support Sotelo's position on this issue. In that case, Sotelo points out, the panel considering the EAJA issue determined that the prior panel decision on the merits conclusively resolved the EAJA issue. *See id.* at 386–87. However, the court there recognized that it was presented with an "unusual" situation, *id.* at 387, in which the "legal standards which governed the merits phase of th[e] litigation [were] precisely those to be applied to the EAJA question," *id.* at 386. Here, as noted above, the panel addressing the merits applied the "substantial evidence" standard, while the issue for EAJA purposes is one of substantial justification. Thus, *Federal Election Commission* does not govern this case.

### 3. Substantial Justification

■ While a decision on the merits ordinarily will not resolve the EAJA question, our decision on the merits in this case places a high hurdle in front of the government. As noted above, we concluded that the Board's decision contained an obvious internal contradiction. Yet, to avoid an award of fees under the EAJA, the government must demonstrate that its position was substantially justified, i.e., "justified to a degree that could satisfy a reasonable person." *Pierce*, 487 U.S. at 565, 108 S.Ct. at 2550. We conclude that the government cannot make such a showing, that the Board's determination lacked substantial justification, and that the district court abused its discretion in holding otherwise.

Contrary to the government's position in this court, the Board's decision denying Sotelo's application for asylum did not turn on the amount of evidence that Sotelo had amassed. The crux of the Board's decision was that Sotelo faced persecution from the Shining Path on account of his leadership position in CUAVES, rather than on account of his political views. The Board concluded that the Shining Path posed a generalized threat to all authority figures in Peru, and therefore that the danger to Sotelo arose from the nature of his position. However, this conclusion was contradicted by the Board's further finding that certain CUAVES leaders, who "have either resigned from their position or been reserved towards the Shining Path," were not threatened. Thus, the Board's own record demonstrated that Sotelo spoke out against the Shining Path and that only those CUAVES members who actively opposed the Shining Path were persecuted: a clear-cut case of persecution based on political acts and expressions.

In its submissions to the district court and to this court, the government makes no serious attempt to justify the reasoning behind the Board's decision. Indeed, even the district court's order denying Sotelo fees under the EAJA shies away from the central premise of the Board's decision. Instead, the government on this appeal attempts to focus attention on two collateral issues: (1) Sotelo's failure to produce written corroboration of

the death threats against him; and (2) Sotelo's alleged failure to demonstrate that he faced danger throughout the entire country of Peru. For the reasons that follow, neither factor leads us to the conclusion that the Board's position was substantially justified.

We do not believe that the Board's decision would have been different if Sotelo had produced the written death threats or had produced more evidence of the Shining Path's reach. Sotelo's failure to produce the written threats was noted as a negative, but by no means dispositive, factor by the Board. More importantly, the Board found that there was no issue of Sotelo's credibility, that his claim was "substantially supported" by documentary evidence, and that Sotelo's testimony was "believable, consistent, and coherent." Moreover, the Board denied a motion made by Sotelo to reopen the proceedings to submit more evidence with respect to the Shining Path's activities, stating that "[t]he current evidence documenting the general continued violence of the Shining Path establishes the general danger faced by political or community leaders in Peru." In light of the foregoing, we cannot see how additional corroborative evidence would have affected the Board's determination.

Nor did the district court, in concluding that the Board's position was substantially justified, properly rely on Sotelo's alleged failure to establish that he was in danger throughout the country of Peru. First, the Board itself attested to the broad scope of the Shining Path's activities when it found that the evidence put forth by Sotelo "establishes that the Shining Path's reaches in Peru are countrywide." Indeed, the evidence of this fact was relied upon by the Board when it denied a motion made by Sotelo to remand the case to the IJ. Moreover, the State Department's one-page advisory letter, which stated that targeted community leaders may sometimes be able to avoid harm by relocating, was entitled to little weight. The letter contained very general conclusions with no evidentiary basis and was directly contradicted by the specific evidence and testimony in the record. *Cf. Halperin v. CIA*, 629 F.2d 144, 148–49 (D.C.Cir.1980).

Although the abuse of discretion standard requires a great deal of deference to determinations made by the district court, we conclude that the district court erred in holding that the Board's decision was substantially justified.

### CONCLUSION

For the foregoing reasons, we reverse the order of the district court and remand the case for the assessment of the appropriate amount of fees and costs under the EAJA.